[Civ. No. 955. Fourth Appellate District.—May 19, 1932.]

CHARLES ERICKSON, Appellant, v. G. A. GERANSON, as Executor, etc., et al., Defendants; JULIA BERG et al., Respondents.

[Civ. No. 956. Fourth Appellate District.—May 19, 1932.]

In the Matter of the ESTATE OF EDWARD JOHNSON, Deceased. CHARLES ERICKSON, Appellant, v. G. A. GERANSON, as Executor, etc., Proponent; JULIA BERG et al., Respondents.

Hamilton, Lindley & Higgins and Frank M. Downer, Jr., for Appellant.

W. J. Mossholder and Harrison G. Sloane for Respondents.

BARNARD, P. J.—Edward Johnson died in September, 1927, leaving an estate valued at approximately $80,000, leaving a will by which he disposed of approximately one-

half thereof, and dying intestate as to the remainder. The appellant concedes that he intended to dispose of all his property by will, but failed to do so because certain real property he owned was worth much more than he thought. In this will Johnson stated that he had no living children, but in two bequests, with much misspelling, he left certain sums to his wife's heirs, and other sums to "my heirs", including $2,000 to Charles Erickson, which was paid during the course of administration.

Before distribution was made in this estate and in May, 1929, Charles Erickson brought an action against the executor and the known heirs for the specific performance of a contract to adopt "in its property aspects". In his complaint he alleges that he was born in Chicago on May 26, 1873; that his father died in 1876 and his mother died on August 20, 1877; that for a time after the death of his mother he was cared for by an aunt, Mary Erickson; that on August 28, 1877, after public announcement to the congregation of the Swedish Mission Church of Chicago, the plaintiff and his sisters and a brother were by their said aunt Mary and the members of said church, and in said church, offered for adoption; that the plaintiff was then and there with the consent of his said aunt and the approval of the membership of said church given into the custody and control of Edward Johnson and his wife, Ida Johnson; that they thereupon publicly agreed with the said aunt and with the membership of said church that in consideration of the surrender of the plaintiff to their custody and control and the waiver by the said aunt of all of her claims upon him, they would receive the plaintiff into their home and adopt him, would bring him up, educate and maintain him as their own child, and would give him the same rights and privileges in all things as a natural child would have, including the right of inheritance; that pursuant to said agreement, plaintiff lived with the Johnsons as their son and for many years was known and is still known to many people as Charles Johnson; that until he grew to young manhood he lived continuously with the Johnsons and rendered to them all the duties and devotion due to parents from their children, and was in all respects treated as their natural son; that he was led to believe and did believe that he was their legally adopted son; that because of this belief, after he reached the age of

maturity he continued to render to them the duties and obligations of a son; and that he has fully performed the contract made on his behalf by his said aunt, but that no legal steps have been taken to adopt him according to law. After then alleging that Ida Johnson predeceased her husband and other facts in reference to the administration of the estate and the property left· by the deceased, the plaintiff prays that the agreement between Edward Johnson and his aunt, Mary Erickson, be specifically enforced; that he be adjudged to be the owner of all of the property left by Edward Johnson and not disposed of by will; and that the defendants be adjudged to hold the property in trust for him.

Subsequently Charles Erickson filed in the estate of Edward Johnson a petition for distribution and an objection to the petition for distribution filed by the executor of the estate, in which he alleges essentially the same facts as are alleged in the complaint referred to, and prays that the agreement between Edward Johnson and Mary Erickson, his aunt, be specifically enforced and that he be adjudged to be, in equity, the adopted son of Edward Johnson, deceased, and entitled to inherit and have distributed to him the residue of said estate undisposed of by will. After answers filed, the issues thus raised in both proceedings were tried together. The court found against the contentions of the plaintiff and petitioner Charles Erickson, and from a judgment entered in the action for specific performance and from the order and decree entered in the estate upon his petition for distribution to him, separate appeals have been taken. These appeals have been consolidated for hearing upon one transcript and one set of briefs.

It is first contended that the evidence does not sustain the findings of the trial court in favor of the respondents in the two proceedings, and the judgment and order which followed. Briefly summarized, these findings were to the effect that. in the first week of November, 1878, Edward Johnson went from his home in Princeton, Illinois, to Chicago, to attend a meeting of the Swedish Mission Church and that his wife· did not accompany him; that at said meeting of said church the congregation was asked to find a home for the appellant; that Edward Johnson was importuned by the congregation of said church to take said child and care for him; that the evidence does not show that any aunt of ap-

pellant was present at said meeting; that Edward Johnson took said child home with him, but with no intention or agreement with anyone to adopt the child; that the appellant remained in the home of Johnson from that time until some time in September or October, 1885; that thereafter, the appellant never made his home or lived with the Johnsons, but left their home, worked for himself and made his own way; that neither the said Edward Johnson nor his wife on or about August 28, 1877, in Chicago or at any other time or place, entered into any agreement or understanding with an aunt of the appellant or with the members of the Swedish Mission Church, by which they agreed to adopt the appellant or maintain him as their own child with the same rights and privileges as a natural child, including the right of inheritance; that no such agreement as that alleged in the complaint was ever made or entered into or agreed to be entered into by either of the Johnsons; and that neither of them held out the appellant to other people as their adopted son.

On behalf of the appellant the record shows the following evidence: He himself testified that his parents died when he was very young, his mother in 1877; that his first recollection of Edward Johnson and his wife, Ida Johnson, was that they were both together in a church with a lot of other people; that ''we were all gathered there to be adopted by somebody''; that someone there stated the reason for their being assembled ''and then they got together and talked things over between themselves, the people that were there, but I was so young I was not interested, you might say''; that when they were ready to leave, Mr. Johnson said, ''Come now, Charlie, we will go'', and that Mrs. Johnson took him by the hand and they walked out (at another time, he testified that when they got ready to leave he went with Mr. Johnson); that he went to live with the Johnsons at Princeton, Illinois; that he called Mr. Johnson ''father'' and Mrs. Johnson ''mother'' and they never objected; that Mrs. Johnson told him ''we will be your father and mother now''; that after a son was born to the Johnsons, they played together as brothers and were treated alike by Mr. and Mrs. Johnson; that he was known as ''Charlie''; that when he was about nine years old they moved to Aurora, Nebraska, and lived on a farm; that he was known there as

Charlie Johnson and helped do chores on the farm; that the Johnsons represented him as "their son, their boy"; that Mr. Johnson referred to his own son and to appellant as "my boys"; that after about four years the Johnsons went back to Princeton, but that he did not go with them but stayed with a Mr. Moberg for a year or a year and a half; that he wanted to stay in Nebraska because he "had formed a liking for Mr. Moberg"; that later he went back to Princeton when Mr. Johnson wrote him a letter asking him if he did not think he had better come home and go to school; that they did not know what train he was coming on; that he went to Sunday-school in Princeton under the name of Charlie Johnson; that in 1887 he wrote his name "Charlie Johnson" in a book; that he went to public school in Princeton; that he helped with the chores and worked two summers "at Arlington"; that he was working at Arlington when Isaac died (this was on November 22, 1889); that about two weeks later he went home; that not very long after that he went to Chicago; that when he left Mr. Johnson gave him his birth certificate and told him to preserve it; that in Chicago he went by the name of Charlie Johnson; that he has lived in Chicago ever since, being married there on December 17, 1898; that shortly after his marriage he and his wife visited the Johnsons at Lafayette, Indiana, where they had moved; that he introduced the Johnsons to his wife as his father and mother; that a year later the Johnsons visited him in Chicago and some years later Mr. Johnson attended the funeral of one of his children; that when he first went to Chicago he went by the name of Charlie Johnson but later he and his brother decided to take their own father's name; and that he saw the Johnsons three times after he was married. His brother, Albert Erickson, two years older, testified that soon after their father and mother died "we were brought to the church and there was an announcement made there was four children for adoption. Anyone who had no children and wanted to take them, why, they were there for adoption. That is all I remember"; that at one time he visited his brother at the Johnson home and found that his brother addressed Mr. and Mrs. Johnson as father and mother, and that he was known as Charlie Johnson. Adolph V. Julin testified that from 1876 on, he was an officer of the Swedish

Mission Church in Chicago; that from his connection with that church he was familiar with its custom about the years 1877 and 1878 regarding orphaned children and that "we used to place them in families that had no children, in families we knew would take care of them. An oral personal agreement was required of the people who took orphan children. That they should adopt them and bring them up as their own children"; that he was not present on the occasion when Edward Johnson took Charlie Erickson but in a general way he was sure it went through the board of the church and that it was general knowledge among the people of the church, at the time and shortly after, that "Edward Johnson had taken Charlie Erickson". Blanche E. Erickson, appellant's wife, testified that they visited the Johnsons shortly after she was married and that her husband introduced the Johnsons to her as his father and mother; that Mrs. Johnson told her that when Charlie first came to them he wanted to go home and she told him "This is your home and we are your father and mother." She also testified that after her marriage she found in her husband's possession a book, on the inside cover of which was written "Charlie Johnson, Princeton, Illinois, December 2, 1887". A sister of appellant testified that she once visited the Johnson home and that the appellant called Mr. and Mrs. Johnson "father and mother". A number of other witnesses who had known the Johnsons at Princeton and at Aurora testified to the following effect: That they first knew the appellant as Charlie Johnson and in later years heard him called Charlie Erickson; that he was generally known in the community as Charlie Johnson; that it was the common reputation in the community that he had been adopted.

On behalf of the respondents, the record shows the following evidence: Frank Johnson (not related to the deceased) testified that he owned a two-story brick house in Princeton; that in October, 1878, Edward Johnson and his wife moved into the second story of this house; that shortly thereafter Edward Johnson went to Chicago for three or four days and returned with the appellant; that Johnson's wife did not accompany him on this trip; that he and his wife and Mrs. Johnson went to the depot to meet Johnson when he returned; that Mrs. Johnson was angry and protested at

his bringing the boy with him; that about three weeks later Mrs. Johnson gave birth to a son, who was named Isaac; that the Johnsons continued to live in his house for about two years and a half, when they moved to Aurora, Nebraska, where they remained for four years; that the Johnsons returned to Princeton, bought this brick house from the witness, and lived in it three or four years before they moved to Indiana; that during these three or four years the witness lived within about 100 feet of the brick house and was on friendly terms with the Johnsons; that when the Johnsons returned to Princeton from Nebraska, the appellant did not come with them; that he visited them a few times thereafter, but never made his home there; that when the appellant returned from Nebraska he went out to work at a farm up near Arlington; that he did not know how many years the appellant worked around there because "I lost track of Charlie altogether after that because I never seen him around"; that he never saw the appellant going to school after the Johnsons returned from Nebraska and knows that he would have seen this had it occurred; that he never heard the Johnsons talk about having adopted the appellant and never heard others say they had adopted him, but he had heard some people say they thought he was adopted; and that he had never heard the Johnsons call him their adopted son. When asked by what name the appellant was known, he replied: "We called him Charlie Erickson." Emma Carlson, a neighbor of the Johnsons at Princeton, testified that Mrs. Johnson was not pleased with her husband's bringing the appellant home, because she was not well; that she knew the appellant before the family went to Nebraska but did not know him after they returned; and that "I think he went to Nebraska and there spent his young days." Magnus Carlson testified that he lived about a block from the Johnsons at Princeton; that Mrs. Johnson did not go to Chicago on the occasion when Mr. Johnson brought the appellant home; that he never heard either Mr. or Mrs. Johnson talk about adopting the child; that he never heard them call the appellant their son; that after the Johnsons returned from Nebraska, he did not see the appellant about their house; and that the appellant was not about, except that he went to work near Arlington. Alfred Nelson testified that he lived next door

to the Johnsons and within sixty feet, after they returned from Nebraska; that he was in the shoe business with Mr. Johnson; that they were good friends and visited and talked every day; and that after they returned from Nebraska no one lived at the Johnson home except Mr. Johnson, his wife and their son, Isaac. E. S. Johnson and his wife (not related to deceased), both testified that they knew Edward Johnson and his wife at Princeton from 1887 to 1889 and that the only child then in the family was Isaac. Ida Swanson testified that she heard people in the neighborhood call the appellant ''Charlie'' and also, ''There were so many Charlies that they would say, Edward Johnson's boy,'' and that she always knew that the appellant's last name was Erickson. A. J. Swanson testified that the appellant remained at Moberg's in Nebraska two or more years, probably two and one-half years, after the Johnsons returned to Princeton; that his name was Charlie Erickson; that he never heard Mr. Johnson say he had adopted this boy; and that he never heard from anyone that Mr. Johnson had adopted him or agreed to adopt him. Fred Anderson testified that he himself lived with the Johnsons fifteen months at one time and two years at a later time; that he heard the Johnsons talk of the appellant as the boy they raised; and that he never heard them call him anything except ''Charlie Erickson''. Several other witnesses testified that the appellant was known as Charlie Erickson.

We think that a mere summary of the evidence is sufficient to show that the findings complained of are amply supported. There is an entire absence of direct evidence that the contract alleged and relied upon was ever made. If it can be said that the evidence as to the subsequent conduct of the parties is such as to have justified a finding in favor of the appellant, it certainly cannot be said that it is such as to compel a trial court to so find upon the issue of fact presented.

Appellant's second point is that reversible error was committed by the trial court in admitting certain evidence to the effect that on two occasions Mrs. Johnson replied ''No'' to an inquiry as to whether they had adopted the appellant; that on another occasion Mr. Johnson made the same answer to a similar question; and that on several occasions both Mr. and Mrs. Johnson spoke of the appellant

as "the boy they had raised". The questions that elicited this testimony were objected to as calling for hearsay and self-serving declarations. The court ruled, "It will be received subject to the objection. It will be stricken out if I become satisfied." It does not appear that this evidence was subsequently stricken from the record, nor was any motion made for that purpose. It may be assumed that the court, by its ruling, assumed the duty of later passing upon the matter and that at least a part of the evidence objected to was inadmissible (*Rulofson* v. *Billings*, 140 Cal. 452 [74 Pac. 35].) Appellant argues that the findings to the effect that Edward Johnson was importuned by the Swedish church to take and care for him; that he so informed his wife upon his return to Princeton; that she was angry on that account; that this was a short time before she gave birth to a son; and that Edward Johnson took the appellant home without any intention or agreement to adopt him, were all based upon these self-serving declarations; that they have no other justification in the evidence; that they are all preliminary to the essential finding that no agreement to adopt was entered into; and that the error was, therefore, sufficiently prejudicial to compel a reversal. Under section 4½ of article VI of the Constitution, it is our duty to examine the evidence for the purpose of discovering whether, in our opinion, a miscarriage of justice has resulted, before ordering a reversal for the reasons stated. The value of this provision of the Constitution is especially apparent in this case, in which, as appellant states in his brief, "all of plaintiff's testimony and most of defendant's are in the form of depositions so this court is in as good a position as the trial court to consider its value and effect". We are unable to agree with appellant that the essential findings have no justification in the evidence, aside from these declarations. All of the special findings referred to are fully supported by other evidence, except the one as to Johnson's having been "importuned" to take the child, and even that follows as a reasonable inference from the other facts shown. In our opinion, the presence or absence of these declarations makes little difference and no miscarriage of justice appears. After all, the burden was upon the appellant to establish his case by satisfactory evidence, and this, we think, he failed to do. The variance between

the proof and the allegations of the complaint is at once apparent. There is no direct evidence whatever of any contract or agreement with the appellant's aunt as alleged in the complaint and petition, and it does not even appear from the evidence that the aunt was present when the child was taken. There is no direct evidence of any agreement at the church meeting with the church members, or with anyone else. Nor do we think the evidence of the subsequent conduct of the parties is sufficiently convincing to establish such an agreement with the certainty and definiteness required. Nowhere in the voluminous transcript is there a word of evidence from anyone that during those fifty years either Johnson or his wife ever told the appellant, or anyone else, that they had adopted or had agreed to adopt or intended to adopt him. The evidence is undisputed that somewhere between the age of twelve and sixteen years the appellant left the home of the Johnsons for good, and that prior thereto he left them for another period of about two years; that he preferred to leave the Johnson home and go to live with the Mobergs because he had formed a liking for Mr. Moberg, and that he was allowed to do this by the Johnsons; that at least by the time he was sixteen, he left their home permanently, at his own desire, to go to Chicago; that at that time Mr. Johnson gave him his own birth certificate and told him to preserve it; that at some time after he went to Chicago, in common with his brother, he chose his own family name; that he married and raised a family under the name of Erickson; and that after he went to Chicago, he never visited the Johnsons but once, shortly after his marriage in 1889, although for years they lived in that region, and although in a number of letters introduced Mr. Johnson said he had looked for him to visit them, but "in vain". Mr. and Mrs. Johnson visited the appellant once in Chicago, and on another occasion Mr. Johnson attended the funeral of appellant's daughter. It appears from the letters that on three occasions the appellant did not know that the Johnsons had moved to another state until long afterward, and that on several occasions when Mr. Johnson went to Chicago he did not visit the appellant because he did not know where he lived. By a great preponderance of the evidence, it appears that Mrs. Johnson was not present at the church

in Chicago when the alleged agreement is supposed to have been made, and that the appellant did not live in the Johnson home after 1885, when he was twelve years old. While the appellant claims that he lived in the Johnson home about four years after 1885, and that he only worked at Arlington during two summers, he himself testified that he was working at Arlington the latter part of November, 1889, when Isaac died, that his intentions were to stay there over the winter, but that he went to Chicago not very long after that. It would appear from the evidence that he used the name "Erickson" fully as much as he used the name "Johnson" and that soon after he went to Chicago he abandoned the name of Johnson entirely. The only material difference between the evidence for the two sides is that according to that for the appellant he stayed in the Johnson home a little longer, he used the name of Johnson a little longer, and some of the neighbors thought he was an adopted child. One of the most persuasive bits of evidence is the letters from the Johnsons, which were introduced. They were all addressed to Charlie Erickson or to his wife Blanche Erickson. They show a friendly interest and no more. It is impossible to read them and to believe that the writers thought they had adopted the appellant. In view of appellant's insistence upon the honesty and integrity of the Johnsons, this circumstance strongly indicates the absence from their minds of any idea that they had made or entered into any such agreement as is alleged and relied upon by the appellant. We think the evidence introduced was not sufficient to establish the contract relied upon; that the evidence, the admission of which is complained of, could not have been controlling; and that such error as appears is not sufficient to justify a reversal.

The only other point raised by appellant is that the court erred in refusing to admit certain evidence offered by him. The testimony of Blanche Erickson, wife of the appellant, was offered, to the effect that after she married the appellant, her mother, since deceased, told her that she remembered the death of appellant's father and mother; that soon thereafter she heard an announcement in church that there would be a meeting on the following Thursday and that the four Erickson children would be adopted; that she attended the meeting at the church the following

Thursday; that various people took the four children respectively; that Mr. and Mrs. Edward Johnson took Charlie; and that the children were taken by the respective parties "as their own". There was also offered the testimony of appellant's sister, who was herself about two years old at the time the appellant was taken by the Johnsons, her testimony being to the effect that her foster mother, who had been dead for more than thirty years, had told her that she was their adopted daughter; that after her father and mother died, it was announced in the church "that there were four orphans that were to be adopted"; that the adoption was in the church; and that Charlie was adopted by Edward Johnson and his wife. It is admitted that this offered evidence is hearsay and ordinarily inadmissible, but it is contended that a new rule should be adopted in California permitting the introduction of hearsay testimony as to ancient events, under certain circumstances. If it be assumed that there might be circumstances justifying such a modification of the rule, we think that such circumstances do not here appear, especially in view of the apparent interest of the parties whose testimony was offered. To reverse a judgment for the refusal of a trial court to admit such evidence, under the circumstances shown by this record, would tend to open the door to innumerable frauds and, in our opinion, would unduly endanger the security of property rights.

Assuming that the complaint and the petition state a cause of action, the requisite proof in support thereof is lacking. Appellant argues that the only established rule in cases of this kind is that "a claimant must prove his case by clear and convincing evidence". Certainly there is nothing in the evidence here that warrants the conclusion that an agreement on the part of the Johnsons to make the appellant their heir by legally adopting him as their own child, has been established with any definiteness and certainty, or by clear and convincing evidence. There is nothing to show that the appellant has ever changed his position in reliance upon such an agreement, or that it would be any fraud upon him not to enforce the same. As was said in *Baumann* v. *Kusian*, 164 Cal. 582 [44 L. R. A. (N. S.) 756, 129 Pac. 986, 988]:

"As we have said, it is settled that to warrant specific enforcement of a contract of the character here alleged, the contract must be definite and certain. It is also settled that it must be just and fair. It was said in *Owens* v. *McNally*, 113 Cal. 444 [33 L. R. A. 369, 45 Pac. 710], 'But the question whether relief should be granted or denied in a particular case addresses itself to the conscience of the chancellor, and before a plaintiff entitles himself to it, many considerations enter and are to be weighed . . . Where a contract such as this, resting in parol and sought to be enforced after the death of the other party to it, comes before a court of equity for review, it is scrutinized and should be scrutinized with particular care, and only upon a satisfactory showing that it is definite and certain and just will it be enforced. The proofs of the contract should be clear, and the acts of the claimant referable alone to the contract.' "

Not only is there in this case a failure of satisfactory proof as to the making of such an agreement, but the evidence fails to show such a performance upon the part of the appellant as should be required in a case of this kind. It clearly appears that he preferred to and did leave the home of his benefactors at a very early age, and just at the time when, in the ordinary course of events, he could have been of some aid and assistance to them and that, thereafter, he assumed his own name and went his own way, with very little interest in the Johnsons for about forty years. Respondents raise the questions of laches and the statute of limitations based upon the fact that this claim arose thirty-two years after the appellant became of age and more than fifty years after the agreement was supposed to have been made. We prefer, however, to treat the case upon its merits without passing upon those contentions. We have read the many cases cited but have found none holding that heirship could be established and the property of a deceased taken upon such evidence as appears in this record.

The judgment and order appealed from are affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of action No. 956 was denied by the District Court of Appeal on June 15, 1932, and

an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 18, 1932.